AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
5/4/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: CD  DEPUTY

United States of America

v.

SERGIO DANIEL SOTO,

Defendant

FILED
CLERK, U.S. DISTRICT COURT
May 4, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: MR  DEPUTY

Case No.   2:22-mj-01744-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about June 30, 2021 through October 14, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms Without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Gary Wallace
Complainant's signature

Gary Wallace, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 4, 2022

Judge's signature

City and state: Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
Printed name and title

AUSA: Lynda Lao (x7167)

**AFFIDAVIT**

I, GARY WALLACE, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against **SERGIO DANIEL SOTO** ("**SOTO**") for a violation of 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license).

2. This affidavit is also made in support of an application for a warrant to search the person of **SOTO**, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(a)(1)(A) (engaging in the business of dealing in firearms without a license); and 922(o)(1) (possession of a machine gun) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent with the Federal Bureau of Investigations ("FBI"), and have been so employed since May 2017. I am presently assigned to the Los Angeles Field Office, where I am responsible for investigating violent crimes, including firearms violations, bank and armored car robberies, murder, extortion, interstate threats, kidnappings and other violations of federal statutes. As a Special Agent, I have received extensive training regarding federal criminal law. I completed 21 weeks of training at the FBI Academy located at Quantico, Virginia, where I received training for investigations of violations of federal law, including surveillance and investigative techniques in support of those investigations. I regularly refer to these laws during the course of my duties and have written and participated in the execution of several state and federal search and arrest warrants in violation of these laws.

6. During the course of my employment with the FBI, I have participated in investigations that employed various investigative techniques, including witness interviews, review of video surveillance, and collection of physical evidence. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by persons engaged in the illegal possession and sale of firearms.

I am also familiar with how these persons use digital devices to facilitate and conceal their crimes.

### III. SUMMARY OF PROBABLE CAUSE

7. From June 30, 2021, to October 14, 2021, **SERGIO DANIEL SOTO ("SOTO")** sold a total of six firearms, seven firearm magazines, and 408 rounds of ammunitions to an individual he believed was a customer, but who was in fact a Confidential Human Source ("CHS")[1] working for the LAPD and FBI. None of the firearms contained an apparent serial number — firearms without serials numbers are commonly known as "ghost guns." **SOTO** has no current, former, or pending applications for any federal firearms licenses.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, conversations with the CHS, review of audio and video recordings, and my own knowledge of the investigation, I am aware of the following:

**A. Background of Investigation**

9. On or about May 12, 2021, law enforcement observed an advertisement on the online marketplace OfferUp for a firearm kit for sale in the Los Angeles area. The firearm kit was advertised as a "P80 Nerf G26 Kit"[2] selling for $900 from a

---

[1] The CHS has no criminal history and assisted law enforcement for community crime abatement, and has been financially compensated for his/her services. The information provided by the CHS has been corroborated by law enforcement surveillance and audio/video recordings. I believe the CHS is reliable and credible.

[2] Based on my training and experience, I know that "P80" is a reference to a Polymer80 ghost gun.

3

seller with the username "Rasta."  That same day, law enforcement also observed an advertisement for a 1997 silver BMW 7 Series vehicle bearing California license plate number 3VMF129 ("the BMW") for sale by "Rasta" on OfferUp.

        a.   Law enforcement obtained the California Department of Motor Vehicle ("CA DMV") database records for the BMW, which identified the vehicle buyer in June 2020 as **SOTO** with California driver's license number Y8150573 and address located at 1446 E 54th Street in Los Angeles, California.

    **B.**   **Initial Contact with SOTO**

   10.  As detailed below, starting on or about June 18, 2021, the CHS, at the direction of the LAPD, contacted **SOTO** via OfferUp's online marketplace platform's messaging feature to inquire about a firearm that **SOTO** had posted for sale in May 2021.

        a.   The CHS sent **SOTO** a picture of the "P80 Nerf G26 Kit" firearm from **SOTO'S** OfferUp page on May 12, 2021, and asked if it was still available.  **SOTO** replied, "Sorry sold out on kits," and "All I have is one built 26, blue frame, black slide with threaded barrel and 10rd mag for 1200."  Based on my training and experience, I understood this to mean that **SOTO** was offering to sell the CHS a fully-assembled two-tone Polymer80 G26 semi-automatic pistol and a 10-round capacity magazine for $1200.00.  The firearm that **SOTO** offered to sell to the CHS was similar to the firearm that **SOTO** advertised for sale on his OfferUp page on May 12, 2021, as both were Polymer80 G26 semi-automatic pistols; however, **SOTO** advertised on OfferUp to sell a

firearm kit, which was presumed to not be fully-assembled. **SOTO** informed the CHS that he no longer had any kits and that he only had "built," or fully-assembled, firearms.[3]

      b.  On or about June 22, 2021, **SOTO** provided the CHS with phone number (323) 770-4102 ("**SOTO'S** phone number") for further contact. The CHS contacted **SOTO** on his phone number via a text message, and **SOTO** texted the CHS a video depicting an unknown individual from a hands-only point of view and where the background appeared to be the desert. The individual was holding a semi-automatic pistol similar to a Polymer80 pistol, with an extended magazine, and the individual fired approximately five rounds off into the distance. The CHS replied via text, "Is this the one for $1200?" and **SOTO** replied, "Yea." **SOTO** later texted the CHS, "You need ammo?" "I got Winchester brand new boxes," and "100rd for 100."

    11.  Using department resources, law enforcement identified the subscriber of **SOTO**'s phone number as both "Sergio D Soto" and "Sergio Rastaa" associated with **SOTO**'s address at 1446 E 54th Street in Los Angeles, California. Additionally, law enforcement identified **SOTO** and M.S. as residents at **SOTO'S** 1446 E 54th Street address. Using department resources, law enforcement confirmed that **SOTO'S** phone number was an active cellular phone number from provider AT&T Mobility.

---

[3] It is my understanding that the reason for the price difference between SOTO's online advertised $900 firearm kit and the $1,200 "built" firearm that he offered to sell to the CHS was due to firearm assembly.

5

      a.   On June 23, 2021, the Honorable J. Cohen-Lauris, Judge of the Superior Court of California, County of Los Angeles, signed a state search warrant, case number 21-448, for data/cell tower location information for **SOTO'S** phone number from AT&T.

      b.   Pursuant to the search warrant, AT&T provided law enforcement with the subscriber information for **SOTO'S** phone number, which revealed the subscriber as M.S., and the address as **SOTO'S** address at 1446 E 54th Street in Los Angeles, California.

   12.   On or about June 28, 2021, the CHS requested to meet for the transaction on Wednesday, June 30, 2021. **SOTO** replied that he "work[s] all day wed," and the CHS replied that the CHS "can pick up." **SOTO** asked the CHS, "Can you pick it up in Long Beach?" and then **SOTO** texted the CHS to meet at "119 W Anaheim St, Wilmington, CA 90744."

      a.   Using department resources, law enforcement identified 119 W Anaheim Street in Wilmington, CA as a business address for a marijuana dispensary.

   13.   On June 30, 2021, before the CHS met with **SOTO**, law enforcement met with the CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any contraband. Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,300 cash.

      a.   Law enforcement surveilled the CHS, who drove to the vicinity of Marine Street and Anaheim Street in Wilmington.

The CHS then walked to and entered the dispensary. The CHS met with **SOTO** inside of the dispensary, where the CHS paid $1,300 cash to **SOTO**, and **SOTO** sold him/her a Polymer80 9mm semi-automatic pistol, bearing no serial number (a ghost gun), which appeared to be operational; a 10-round 9mm-caliber magazine; and 100 rounds of 9mm-caliber ammunition.

      b.    Law enforcement observed a tan 2007 Nissan Maxima vehicle bearing California license plate number 6EBB512 parked in the vicinity of the dispensary during the time of the controlled purchase.

      c.    After the purchase was complete, the CHS departed the dispensary, returned to the CHS's vehicle, and drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband.

    **C.**    **July 8, 2021: SOTO Sells a Ghost Gun and a Large-Capacity Magazine to the CHS**

    14.    Starting on or about July 7, 2021, at the direction of the LAPD, the CHS communicated with **SOTO** via text message and negotiated the purchase of a pistol with a magazine for $1,200 to take place on or about July 8, 2021.

      a.    **SOTO** also texted the CHS a picture of a black item against a white background.

      b.    I have reviewed the picture of this black item and understand it to be a drop-in auto sear ("SEAR"), which is inserted into semi-automatic assault rifles and assault pistols in order to modify them to be fully automatic machine guns

7

capable of firing more than one shot without manually reloading, by a single function of the trigger.

15. On July 8, 2021, before the CHS met with **SOTO**, law enforcement met with CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any contraband. Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,200 cash.

   a.  Law enforcement surveilled the CHS, who drove to the vicinity of Marine Street and Anaheim Street in Wilmington. The CHS then walked to and entered the same dispensary. The CHS met with **SOTO** inside of the dispensary, where the CHS paid $1,200 cash to **SOTO**, and **SOTO** sold him/her a 9mm semi-automatic pistol, bearing no serial number (a ghost gun), which appeared to be operational, and a 33-round 9mm-caliber magazine.

   b.  After the purchase was complete, the CHS departed the dispensary, returned to the CHS's vehicle, and drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband.

   D.  **July 22, 2021: SOTO Sells a Ghost Gun, a Magazine, and Ammunition to the CHS**

16. Starting on or about July 16, 2021, at the direction of the LAPD, the CHS communicated with **SOTO** via text message and negotiated the purchase of a pistol, a magazine and ammunition for $1,400 on or about July 22, 2021. The CHS also asked **SOTO** if he "still got the sear?" and **SOTO** replied, "I don't. I won't have some till next week."

8

17. On July 22, 2021, before the CHS met with **SOTO**, law enforcement met with CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any contraband. Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,400 cash.

   a. Law enforcement surveilled the CHS, who drove to the vicinity of Marine Street and Anaheim Street in Wilmington. The CHS then walked to and entered the same dispensary. The CHS met with **SOTO** inside of the dispensary, where the CHS paid $1,400 cash to **SOTO**, and **SOTO** sold him/her a 9mm semi-automatic pistol, bearing no serial number (a ghost gun), which appeared to be operational; a 10-round 9mm-caliber magazine; and 64 rounds of 9mm-caliber ammunition.

   b. After the purchase was complete, the CHS departed the business, returned to the CHS's vehicle, and drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband.

   **E.    July 28, 2021: SOTO Sells a Ghost Gun, a Large-Capacity Magazine, a Second Magazine, and Ammunition to the CHS**

18. Starting on or about July 27, 2021, at the direction of the LAPD, the CHS communicated with **SOTO** via text message and negotiated the purchase of a pistol and magazine for $1,690 cash on or about July 28, 2021.

19. On July 28, 2021, before the CHS met with **SOTO**, law enforcement met with CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any contraband.

9

Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,890 cash.[4]

    a. Law enforcement surveilled the CHS, who drove to the vicinity of Marine Street and Anaheim Street in Wilmington. The CHS then walked to and entered the same dispensary. The CHS met with **SOTO** inside of the dispensary, where the CHS paid $1,890 cash to **SOTO**, and **SOTO** sold him/her a 9mm semi-automatic pistol, bearing no serial number (a ghost gun), which appeared to be operational; a 17-round 9mm-caliber magazine; a 10-round 9mm-caliber magazine; and 217 rounds of 9mm-caliber ammunition.

    b. After the purchase was complete, the CHS departed the dispensary, returned to the CHS's vehicle, and drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband.

### F. August 19, 2021: SOTO and E.P. Sell a Ghost Gun and a Large-Capacity Magazine to the CHS

20. Starting on or about August 17, 2021, at the direction of the LAPD, the CHS communicated with **SOTO** via text message and negotiated the purchase of a pistol and a 33-round capacity magazine for $1,200 to take place on or about August 19, 2021. **SOTO** texted the CHS to meet near of the corner of "3rd st and rampart" Boulevard in Los Angeles.

21. On August 19, 2021, before the CHS met with **SOTO**, law enforcement met with the CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any

---

[4] The initial negotiated price was $1,690 for a firearm and a magazine; however, the additional $200 in the actual controlled purchase price was for the approximately 200 rounds of ammunition.

contraband.  Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,200 cash.

        a.   Law enforcement surveilled the CHS, who drove to the vicinity of Coronado Street and Beverly Boulevard in Los Angeles, California.  The CHS then walked to and entered a gray Kia vehicle that was parked on Coronado Street near Beverly Boulevard.  The CHS entered the back seat of the Kia and met with **SOTO**, who was sitting in the front passenger seat, and another male, who was sitting in the driver seat and was introduced as **SOTO**'s friend "E."  The CHS paid the $1,200 cash to "E", and the CHS took a 9mm semi-automatic pistol, bearing no serial number (a ghost gun), and a 33-round 9mm-caliber magazine that were in the back seat of the Kia.

        b.   After the purchase was complete, the CHS departed the Kia, returned to the CHS's vehicle, and drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband.  Law enforcement showed the CHS a CA DMV photograph of **SOTO** and the CHS identified **SOTO** as the seller.

        **G.   October 14, 2021: SOTO Sells a Fully Automatic Ghost Gun and a Large-Capacity Magazine to the CHS**

    22.   Starting on or about October 7, 2021, at the direction of the LAPD, the CHS communicated with **SOTO** via text message and negotiated the purchase of a fully automatic assault rifle-style firearm and a magazine for $1,700 on or about October 14, 2021.

**SOTO** texted the CHS to meet at "206 S Coronado St, Los Angeles, CA 90057."

23. On October 14, 2021, before the CHS met with **SOTO**, law enforcement met with CHS at a pre-determined location, searched the CHS and the CHS's vehicle, and did not find any contraband. Law enforcement supplied the CHS with an audio/video recording device, an audio recording device/transmitter, and $1,700 cash.

    a. Law enforcement surveilled the CHS, who drove to the vicinity of 206 S Coronado Street, Los Angeles, California 90057. Law enforcement observed **SOTO** exit a vehicle that was parked near the CHS's vehicle. **SOTO** carried a bag, walked to and entered the front passenger door of the CHS's vehicle. The CHS paid $1,700 cash to **SOTO**, and **SOTO** sold a 5.56mm-caliber semi-automatic assault pistol, bearing no serial number (a ghost gun), which appeared to be operational and contained a SEAR; a 30-round 5.56mm-caliber magazine; and 29 rounds of .223-caliber ammunition.

    b. After the purchase was complete, **SOTO** exited the CHS's vehicle, and the CHS drove to a pre-determined location where law enforcement searched the CHS and the CHS's vehicle, and did not find any contraband. Law enforcement showed the CHS a CA DMV photograph of **SOTO** and the CHS identified **SOTO** as the seller.

    **H. ATF Firearm Licensing System Database Search for SOTO and Firearms Examination**

24. On or about April 5, 2022, an ATF Special Agent conducted a search of the ATF's Firearm Licensing System

database for **SOTO**. The database search revealed that there were no active, inactive or pending Federal Firearm Licenses for **SOTO**.

25. On or about April 28, 2022, an FBI Special Agent certified as a firearms examiner through the ATF examined all six firearms sold by **SOTO** to the CHS and determined that they were firearms as defined in 18 U.S.C. § 921(a)(3).

### V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

26. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

    b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

13

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.  Those who illegally possess firearms sometimes sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      d.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently

---

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    28.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of

electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

  b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

 29. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

  a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

  b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

17

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **SOTO**'s thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of **SOTO**'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

30. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

31. For all of the reasons described above, there is probable cause to believe that **SERGIO DANIEL SOTO** has committed a violation of 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 4th day of May, 2022.

_____
THE HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE